# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

John M. Vasil, D.O., : 
Laura O'Farrell, RN and : 
ADARA Healthcare Staffing, Inc., : 
                  Petitioners : 
                    : 
         v. : No. 344 M.D. 2013
             : Argued:  February 10, 2020
             : 
Department of Military and : 
Veterans Affairs, : 
           Respondent : 

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE J. ANDREW CROMPTON, Judge

**OPINION BY JUDGE BROBSON**        **FILED:  April 24, 2020**

Petitioners John M. Vasil, D.O. (Dr. Vasil), Laura O'Farrell, RN (O'Farrell), and ADARA Healthcare Staffing, Inc. (ADARA)[1] filed a second amended petition for review (Petition) in the Court's original jurisdiction, asserting claims against Respondent Department of Military and Veterans Affairs (DMVA) under the Whistleblower Law[2] and the Medical Care Availability and Reduction of Error Act

---

[1] ADARA and O'Farrell both filed a "Praecipe to Settle, Discontinue and End with Prejudice" their involvement in this case on February 4, 2019.  The Court, by order dated February 6, 2019, directed the Chief Clerk, now Prothonotary, to mark the matter as discontinued and ended as to the aforementioned petitioners.

[2] Act of December 12, 1986, P.L. 1559, *as amended*, 43 P.S. §§ 1421-1428. "[T]he Whistleblower Law is . . . chiefly a remedial measure intended to 'enhance openness in government and compel the government's compliance with the law by protecting those who inform authorities of wrongdoing.'" *O'Rourke v. Dep't of Corr.*, 778 A.2d 1194, 1202 (Pa. 2001) (citations omitted).

(MCARE Act).[3] Following the Court's discontinuance of the matter as to ADARA and O'Farrell, DMVA filed a motion for summary relief as to the sole remaining claim—*i.e.*, Dr. Vasil's claim in Count II of the Petition that DMVA retaliated against Dr. Vasil in violation of the Whistleblower Law and MCARE Act. Specifically, Dr. Vasil contends that DMVA retaliated against him for reporting serious events or incidents at the Hollidaysburg Veterans' Home (HVH) pertaining to the quality of medical care received by patients at HVH when it terminated a contract with ADARA and when it interfered with his attempts to secure employment elsewhere. For the reasons that follow, we deny the application for summary relief concerning DMVA's alleged retaliation against Dr. Vasil by terminating its contract with ADARA and grant the application for summary relief concerning DMVA's alleged interference with Dr. Vasil's prospective contract with Liberty Healthcare Corporation (Liberty).

## I.    BACKGROUND

### A. Hollidaysburg Veterans' Home

DMVA is an executive administrative department of the Commonwealth that oversees the operation of the HVH, located in Blair County, Pennsylvania. DMVA requested bids to provide certain on-site medical services at HVH. ADARA, through its president, O'Farrell, responded to the invitation to bid. DMVA selected ADARA to be the HVH medical provider.

The terms of the contract between DMVA and ADARA (Contract) required ADARA to provide a physician as the Medical Director, a physician as the Assistant Medical Director, two certified registered nurse practitioners (CRNP), and

---

The Whistleblower Law is "not primarily designed to punish an employer for harboring retaliatory motives." *Id.*

[3] Act of March 2, 2002, P.L. 154, *as amended*, 40 P.S. §§ 1303.101-.910.

2

laboratory and radiology services at HVH. The Contract's scope of work specified that "[t]he physician will be providing communications/physician orders to Commonwealth staff, but will not supervise Commonwealth staff. The physician [M]edical [D]irector shall be under the general supervision of the Commandant with clinical performance monitored by the Chief of Clinical Services of [DMVA's] Bureau of Veterans Homes." (Petition, ¶ 11, Exhibit A-Bid and Contract, HVH Medical Services Scope of Work, ¶ 17.) The Contract, in part, required ADARA to provide, on an as-required basis, a Problem Identification Report, identifying problem areas and possible course of action and/or recommendations.

ADARA hired Dr. Vasil to be the Medical Director. O'Farrell, in addition to being ADARA's president, served as a nurse, assisting Dr. Vasil in his work at HVH. Deborah Nesbella, who was not a physician, served as the Commandant at HVH, and John Bart, D.O. (Dr. Bart) held the position of Chief of Clinical Services of DMVA's Bureau of Veterans Homes.

### 1. Quality of Medical Care Concerns at HVH

After ADARA assumed its responsibilities under the Contract, O'Farrell reported concerns about the quality of medical care being provided to patients at HVH to Dr. Bart, who scheduled a meeting with Dr. Vasil and O'Farrell for August 21, 2012.[4] Dr. Vasil and O'Farrell reported a concern to Dr. Bart that involved a patient in hospice care. Specifically, Dr. Vasil expressed his opinion that

---

[4] Dr. Vasil and O'Farrell contend that, prior to reporting concerns to Dr. Bart, they reported various issues, including patients not having necessary and required tests performed, not getting required blood work completed, not being provided with appropriate medication, and not being given a choice of providers for hospice care, to Commandant Nesbella. DMVA disputes that Commandant Nesbella or the director of nursing at HVH, Rebecca Dale, were aware of any concerns during the time frame averred in the Petition.

3

the patient did not require hospice care and that DMVA was improperly referring psychiatric patients at HVH to hospice care.

Thereafter, on September 3, 2012, O'Farrell sent via email a report to Dr. Bart, in which she expressed additional concerns about the quality of medical care at HVH. In the report, O'Farrell identified eighteen specific issues, including: (1) a patient in need of oxygen but not receiving it; (2) a patient with untreated high cholesterol and triglycerides; (3) a patient with untreated anemia; (4) a patient with untreated cellulitis on the leg; (5) a patient with an infection for which no antibiotics were prescribed; and (6) a patient with undiagnosed and untreated shingles. The following day, on September 4, 2012, O'Farrell again sent a report to Dr. Bart via email, this time identifying new quality of medical care issues found that day: (1) a patient with a urinary tract infection but not prescribed an antibiotic; (2) a patient with a history of heart problems but not prescribed Coumadin; (3) a patient with a wound but not prescribed antibiotics; and (4) a patient with high blood pressure but not treated properly.

O'Farrell sent yet another report to Dr. Bart on September 5, 2012, describing the following issues identified that day: (1) a patient with an untreated low potassium level; (2) a patient with an unreported gastrointestinal bleed; (3) a patient with unreported and untreated pink eye; and (4) a patient with a low white blood cell count for which there was no follow-up medical care. In that email, O'Farrell wrote that she was "getting extremely anxious of the care of these residents" and requested an "emergency plan of action" be put in place "immediately" due to concerns regarding the quality of medical care that ADARA observed at HVH. Soon thereafter, O'Farrell met with DMVA staff, including Dr. Bart, at DMVA's headquarters to discuss these concerns.

4

## 2. DMVA's and ADARA's Actions Following Reports

After the meeting at DMVA's headquarters, DMVA sent a letter to ADARA on September 28, 2012 (cure letter), requesting ADARA provide a written and detailed Corrective Action Plan concerning deficiencies DMVA observed in ADARA's performance under the terms of the Contract. It appears that DMVA asserted in the letter that Dr. Vasil was not providing all the functions outlined in the Contract's statement of work, including attending morning meetings, quality assurance meetings, department head meetings, and behavioral health team sessions, and DMVA also expressed concerns regarding Dr. Vasil's professionalism related to inappropriate language in front of the residents at HVH.

ADARA responded to the cure letter via letter dated October 9, 2012. In its response, ADARA noted that HVH department meetings were not clearly defined and informed DMVA that a second physician would be attending the scheduled meetings. ADARA addressed the professionalism concerns with Dr. Vasil and explained to DMVA that, while ADARA does not condone the inappropriate language issues noted, Dr. Vasil was "extremely frustrated and under a lot of pressure with the overwhelming issues that have been part of HVH." On October 29, 2012, DMVA sent to ADARA a second letter, seeking a revised Corrective Action Plan to cure the issues it felt were not adequately addressed in ADARA's October 9, 2012 letter. ADARA responded to DMVA's letter on November 8, 2012.

Sometime in November 2012, Dr. Bart, Commandant Nesbella, the Commandant's supervisor (Dee McPherson), and O'Farrell attended an emergency meeting. At the meeting, O'Farrell again complained about the quality of medical care at HVH, and DMVA denied that there were ongoing quality of medical care

5

issues. O'Farrell, not satisfied with the outcome of the aforementioned meeting, sent an email to DMVA Deputy Adjutant General Michael Gould (Gould) concerning the "many issues" at HVH. Dr. Vasil and O'Farrell requested a face-to-face meeting with Adjutant General Gould. Although the email came from O'Farrell, both O'Farrell's and Dr. Vasil's names appear as part of the signature line of the email.

On or about January 2, 2013, O'Farrell attempted to arrange with HVH a start date and orientation for a second CRNP hired by ADARA; specifically, ADARA sought to arrange a start date of January 9, 2013. As of January 10, 2013, DMVA had not been able to accommodate orientation and a start date.

### 3. Influenza Outbreak

On January 10, 2013, a HVH patient was diagnosed with influenza. While standard operating procedure required notification to the Medical Director of such a diagnosis, HVH did not inform Dr. Vasil that day. Once aware of the diagnosis the following day, Dr. Vasil expressed concern regarding the level of preventative measures being taken to avoid a widespread influenza outbreak. Dr. Vasil advocated for the administration of Tamiflu (a medication used to treat symptoms of influenza virus) to all residents at HVH, but DMVA did not have enough doses to treat proactively all residents and staff. Dr. Vasil also advocated for HVH to quarantine the building where the influenza patient was located, but HVH initially quarantined only the influenza patient. Eventually, other HVH residents in the building began to display influenza symptoms, and HVH quarantined the entire building. On January 13, 2013, O'Farrell sent an email to Dr. Bart and other high level DMVA staff, complaining about the failure of DMVA to inform Dr. Vasil of the positive influenza test and follow-up with him. O'Farrell demanded a "full-scale investigation."

6

*4. Termination of Contract*

By letter dated January 14, 2013, DMVA informed ADARA that it was terminating the Contract for cause for the following reasons: (1) ADARA's failure to provide two CRNPs as required by the Contract; (2) Dr. Vasil's failure to provide all the duties of the Medical Director under the Contract; (3) Dr. Vasil's bypassing of HVH's policy and procedures on hospice referrals; and (4) ADARA's schedule changes that resulted in unnecessary overtime hours for HVH staff. DMVA, by terminating the Contract, effectively removed Dr. Vasil as Medical Director at HVH, as he was an ADARA employee.

## B. Ebensburg Center

The Department of Public Welfare (DPW)[5] contracted with Liberty to provide medical services to the residents at the Ebensburg Center, located in Cambria County, Pennsylvania. Following termination of the Contract, Dr. Vasil sought employment as a physician at the Ebensburg Center. The Liberty Medical Director at the Ebensburg Center interviewed Dr. Vasil on July 9, 2013, and subsequently approved Dr. Vasil to work at the Ebensburg Center. Dr. Vasil signed a Subcontract Agreement with Liberty. Liberty, thereafter, sent Dr. Vasil a letter, which provided: "As you were made aware, in light of the fact that Ebensburg Center . . . has not provided its approval for the commencement of your services, Liberty . . . must revoke its offer to you for the provision of your services for Liberty at Ebensburg [Center]." (Petition, Exhibit R.)

---

[5] In November 2014, the General Assembly renamed DPW as the Department of Human Services; however, during the relevant time period of this case it was still DPW, so we will refer to it as DPW herein. *See* Section 103 of the Human Services Code, Act of June 13, 1967, P.L. 31, *as amended*, added by the Act of September 24, 2014, P.L. 2458, 62 P.S. § 103 (effective November 24, 2014).

7

## II. ISSUES

Dr. Vasil alleges that DMVA's reasons for terminating the Contract were pretextual. Specifically, Dr. Vasil contends that DMVA terminated the Contract because ADARA, Dr. Vasil, and O'Farrell had repeatedly complained about substandard care being provided to patients; escalated their concerns over the heads of Commandant Nesbella and Dr. Bart when they contacted those individuals' superiors; and complained of the inadequate and improper response to the flu outbreak, which Dr. Vasil contends led to the death of patients. He maintains that his actions were protected by the MCARE Act. Dr. Vasil asserts that DMVA retaliated against him by terminating its Contract with ADARA and by improperly and illegally interfering in his contract with Ebensburg Center, resulting in the revocation of Ebensburg Center's approval of his entering into a subcontract agreement with Liberty. He contends that he has been financially harmed by this retaliation.

DMVA, in its motion for summary relief, argues that Dr. Vasil failed to allege facts essential to prove an element of his claim under the Whistleblower Law, because he failed to assert that DMVA retaliated against him regarding *his* compensation, term, conditions, location, or privileges of *his employment with DMVA*. DMVA notes that it was ADARA that retained Dr. Vasil to be the Medical Director of HVH, and, despite HVH's termination of the Contract, DMVA entered into a provider agreement with Dr. Vasil to continue to treat patients at HVH. Quite simply, DMVA contends that Dr. Vasil has not alleged that his ability to continue to provide medical services at HVH was terminated because of his reports of wrongdoing, and, therefore, DMVA is entitled to summary relief.

8

DMVA further argues that if this Court considers the legal theory that the Whistleblower Law prevents DMVA from retaliating against Dr. Vasil by interfering with prospective employment, DMVA is still entitled to summary relief because there is no causal connection between Dr. Vasil's alleged reports of wrongdoing and Dr. Vasil's failure to secure employment with Liberty at Ebensburg Center. DMVA contends that: (1) Dr. Vasil never alleged that he was instructed not to file complaints concerning quality of medical care issues and that, in fact, the Contract required such concerns to be provided to DMVA in reports; (2) six months lapsed between Dr. Vasil's last claimed report of wrongdoing and the revocation of his prospective contract with Liberty; (3) Dr. Vasil has failed to produce any facts to prove that DMVA interfered in any way with his prospective contract with Liberty; and (4) as asserted by Dr. Vasil, his prospective contract with Liberty was subject to a renovation clause by the DPW—not DMVA. DMVA contends that, without any causal connection between Dr. Vasil's reports that he was obligated to provide DMVA and the alleged retaliation or evidence to prove that DMVA interfered with his prospective contract with Liberty, DMVA is entitled to summary relief on this alternative theory.

### III. DISCUSSION

#### A. Motion for Summary Relief

"At any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Pa. R.A.P. 1532(b); *see also Summit Sch., Inc. v. Dep't of Educ.*, 108 A.3d 192, 195 (Pa. Cmwlth. 2015). A court "must determine, based on the undisputed facts, whether 'either party has a clear right to the relief requested.'" *Id*. (quoting *Bell Atl.-Pa., Inc. v. Tpk. Comm'n*, 703 A.2d 589, 590 (Pa.

9

Cmwlth. 1997), *aff'd*, 713 A.2d 96 (Pa. 1998)). "The record, for purposes of [a] motion for summary relief is the same as a record for purposes of a motion for summary judgment." *Summit Sch., Inc.*, 108 A.3d at 195-96.

The Pennsylvania Supreme Court has cautioned that when "the parties' disparate takes on the record and the interpretations they draw from it suggest . . . there are disputed issues of material fact . . . when viewed in the light most favorable to appellant as the non-moving party, [the court] should have precluded summary [relief] in favor of [the] appellees." *Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300, 307 (Pa. 2015). "In summary [relief] proceedings, . . . the court's function [is not to] determine facts, but only to determine if a material issue of fact exists." *French v. United Parcel Serv.*, 547 A.2d 411, 415 (Pa. Super. 1988) (citation omitted).

DMVA, as the moving party, has the burden of proving the non-existence of any genuine issue of fact. *See Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 468-69 (Pa. 1979). "A material fact is one that directly affects the outcome of the case." *Dep't of Envtl. Prot. v. Delta Chems., Inc.*, 721 A.2d 411, 416 (Pa. Cmwlth. 1998) (en banc) (*Delta Chemicals*). "The facts which directly affect the outcome of the case are gleaned from considering the substantive law underlying the cause of action." *Id.*

**B. Whistleblower Law and MCARE Act**

The gist of Dr. Vasil's claim is based on his contention that he, as a health care worker, is entitled to protection under the Whistleblower Law because DMVA retaliated against him for reporting, as required by Section 308(c) of the MCARE Act, 40 P.S. § 1303.308(c), serious events or incidents that occurred at HVH. "The Whistleblower Law provides protection for employees of a public employer who report a violation or suspected violation of state law." *Bailets*, 123 A.3d at 307.

10

An employee asserting a whistleblower claim "must show by a preponderance of the evidence that, prior to the alleged reprisal, [he] or a person acting on behalf of the employee had reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority."[6] Section 4(b) of the Whistleblower Law, 43 P.S. § 1424(b).

The Whistleblower Law, however, "is not designed to provide insurance against discharge or discipline for an employee who informs on every peccadillo of his fellow employees." *Evans v. Thomas Jefferson Univ.*, 81 A.3d 1062, 1070 (Pa. Cmwlth. 2013) (quoting *Golaschevsky v. Dep't of Envtl. Res.*, 683 A.2d 1299, 1304 (Pa. Cmwlth. 1996), *aff'd*, 720 A.2d 757, 759 (Pa. 1998)). For purposes of a claim under the Whistleblower Law, a report of a "serious event or incident" under the MCARE Act constitutes a report subject to protection under the Whistleblower Law. *See* Section 308(c) of the MCARE Act. Section 308(c) of the MCARE Act provides that "[a] health care worker who reports the occurrence of a serious event or incident in accordance with subsection (a) or (b) shall not be subject to any retaliatory action for reporting the serious event or incident and shall have the protections and remedies set forth in . . . the Whistleblower Law."[7] Furthermore, Section 308(a) of

---

[6] The Whistleblower Law defines a "good faith report" as "[a] report of conduct defined in this act as wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true." Section 2 of the Whistleblower Law, 43 P.S. § 1422.

[7] Section 302 of the MCARE Act, 40 P.S. § 1303.302, defines "health care worker" as "[a]n employee, independent contractor, licensee or other individual authorized to provide services in a medical facility." It further defines "serious event" as "an event, occurrence, or situation involving the clinical care of a patient in a medical facility that results in death or compromises patient safety and results in an unanticipated injury requiring delivery of additional health care services . . . . The term does not include an incident." 40 P.S. § 1303.302. As to the term "incident," Section 302 of the MCARE Act defines it as:

11

the MCARE Act, 40 P.S. § 1303.308(a), mandates that a health care worker report the occurrence of a serious event or illness:

> A health care worker who reasonably believes that a serious event or incident has occurred shall report the serious event or incident according to the patient safety plan of the medical facility unless the health care worker knows that a report has already been made. The report shall be made immediately or as soon thereafter as reasonably practicable, but in no event later than 24 hours after the occurrence or discovery of a serious event or incident.

The employee asserting a claim under the Whistleblower Law must demonstrate "by concrete facts or surrounding circumstances that the report . . . led to . . . [his] dismissal, such as that there was specific direction or information received not to file the report or that there would be adverse consequences because the report was filed." *Evans*, 81 A.3d at 1070 (Pa. Cmwlth. 2013) (citing *Golaschevsky*, 720 A.2d at 759). "Only where [the] plaintiff has satisfied the threshold showing of a causal connection" does the burden shift "to the defendant to show a separate and legitimate reason for its actions." *Id.* (citing *O'Rourke*, 778 A.2d at 1200). This is borne out in Section 4(c) of the Whistleblower Law, 43 P.S. § 1424(c), which provides that "[i]t shall be a defense to an action under this section if the defendant proves by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual."

---

> An event, occurrence or situation involving the clinical care of a patient in a medical facility which could have injured the patient but did not either cause an unanticipated injury or require the delivery of additional health care services to the patient. The term does not include a serious event.

A "medical facility" is defined as "[a]n ambulatory surgical facility, birth center, hospital or abortion facility." *Id.*

12

## 1. *Loss of Medical Director Position*

DMVA argues that Dr. Vasil has failed to assert that DMVA retaliated against *him* regarding his compensation, term, conditions, location, or privileges of his employment with *DMVA*. Instead, DMVA maintains that the action it took—*i.e.*, terminating the Contract—was directed at ADARA only and not at Dr. Vasil, who was merely an employee of ADARA. Dr. Vasil counters that DMVA's action in terminating the Contract necessarily resulted in an adverse employment action against him, as he was stripped of his position as Medical Director. He argues that he is not required to allege or establish that DMVA completely eliminated his ability to perform medical services at HVH because of his reports of wrongdoing in order to prevail on his whistleblower claim. Instead, Dr. Vasil submits that he only needs to allege and ultimately establish that he suffered an "adverse employment action" because of the reports of wrongdoing. Dr. Vasil argues that his discharge as Medical Director because of his reports of wrongdoing was an adverse employment action.

The Whistleblower Law does not define the terms "adverse employment action" or "adverse consequences." Section 2 of the Whistleblower Law, 43 P.S. § 1422. Section 3 of the Whistleblower Law, 43 P.S. § 1423(a), provides that:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer defined in this act.

"Generally speaking, the Whistleblower Law precludes a public body from taking any *adverse employment action* against an employee in retaliation for the

13

employee's good faith report of wrongdoing or waste." *Scrip v. Seneca*, 191 A.3d 917, 925 (Pa. Cmwlth. 2018) (en banc) (emphasis added), *appeal denied*, 201 A.3d 151 (Pa. 2019). Cases by Pennsylvania courts have not discussed adverse employment actions under the Whistleblower Law in any great detail, so a review of federal cases on what constitutes an "adverse employment action" is helpful.[8]

An adverse employment action is an action that a reasonable employee would have found to be materially adverse, "such that the action well might have dissuaded a reasonable worker from taking a protected action." *Greineder v. Masonic Homes of the R.W. Grand Lodge*, (E.D. Pa., No. 13-2376, filed Apr. 23, 2014) 2014 WL 1632143, at *5 (reviewing Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2611-2654, Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963). An employee "must show only that a reasonable person would believe their working conditions had been altered to establish an adverse employment action." *Valenti v. Maher Terminals LLC*, (D.N.J., No. 14-7897(JLL)(JAD), filed June 30, 2015) 2015 WL 3965645, at * 4 (reviewing FMLA). Adverse employment actions may include demotion and transfers to less desirable positions. *Johnson v. Cmty. Coll. of Allegheny Cty.*, 566 F. Supp. 2d 405, 430 (W.D. Pa. 2008) (reviewing Title VII of Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17).

When Dr. Vasil served as HVH's Medical Director pursuant to DMVA's contract with ADARA, he received a salary for the services he provided as Medical Director. About two months after DMVA terminated the Contract, DMVA entered

---

[8] Federal district court decisions "may offer guidance, but they are not binding precedent upon this Court." *Gould v. City of Aliquippa*, 750 A.2d 934, 938 (Pa. Cmwlth. 2000).

into a provider agreement with Dr. Vasil. The provider agreement did not reinstate Dr. Vasil as Medical Director, and, while DMVA did not completely eliminate his ability to perform medical services at HVH, Dr. Vasil still lost his Medical Director salary. An employee's loss of income is an adverse consequence that would dissuade a reasonable worker from reporting serious events or incidents under the MCARE Act. Thus, we disagree with DMVA that Dr. Vasil has not advanced any facts that could establish that DMVA retaliated against him with regard to his employment with DMVA. DMVA's motion for summary relief, therefore, is denied to the extent that it is based on DMVA's contention that Dr. Vasil cannot establish that DMVA took any adverse action against him with regard to his employment with DMVA.[9]

### 2. *Loss of Liberty Position at Ebensburg Center*

DMVA's alternative argument is that Dr. Vasil cannot establish any facts in support of his contention that DMVA took steps to interfere with his prospective employment with Liberty in retaliation for his earlier reports regarding the quality of medical care at HVH. At oral argument in this case on February 10, 2020, Dr. Vasil's counsel conceded that he could not prove that DMVA interfered with his prospective contract with Liberty at Ebensburg Center. For these reasons, we will grant DMVA's motion for summary relief on this claim.

---

[9] We are cognizant of DMVA's argument that Dr. Vasil never alleged that he was instructed not to file complaints concerning quality of medical care issues and that, in fact, the Contract required such concerns to be provided to DMVA in reports. (Brief in Support of Respondent's Motion for Summary Relief at 9). The fact that Dr. Vasil was required to provide quality of medical care reports to DMVA pursuant to the Contract does not eliminate the possibility that DMVA could have retaliated against him in violation of the MCARE Act for submitting the reports.

15

## IV. CONCLUSION

Accordingly, we deny DMVA's application for summary relief concerning DMVA's alleged retaliation against Dr. Vasil by terminating its Contract with ADARA, and we grant DMVA's application for summary relief concerning DMVA's alleged interference with Dr. Vasil's prospective contract with Liberty.

 

P. KEVIN BROBSON, Judge

# THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| John M. Vasil, D.O., | : | |
| Laura O'Farrell,, RN and | : | |
| ADARA Healthcare Staffing, Inc., | : | |
| Petitioners | : | |
| | : | |
| v. | : | No. 344 M.D. 2013 |
| | : | |
| Department of Military and | : | |
| Veterans Affairs, | : | |
| Respondent | : | |

# **O R D E R**

AND NOW, this 24th day of April, 2020, the Department of Military and Veterans Affairs' (DMVA) motion for summary relief (Motion) as to the sole remaining count (Count II) of Petitioners' second amended petition for review is DENIED, in part, and GRANTED, in part. The Motion is DENIED to the extent DMVA seeks summary relief on Petitioner John M. Vasil, D.O.'s (Dr. Vasil) claim that DMVA unlawfully retaliated against him by terminating its contract with ADARA Healthcare Staffing, Inc., and the Motion is GRANTED to the extent that DMVA seeks summary relief on Dr. Vasil's claim that DMVA unlawfully retaliated against him by allegedly interfering with Dr. Vasil's prospective contract with Liberty Healthcare Corporation.

P. KEVIN BROBSON, Judge